1    Bret A. Stone      SBN 190161   BStone@PaladinLaw.com
     Melanie A. Mariotti    SBN 309000   MMariotti@PaladinLaw.com
2    PALADIN LAW GROUP® LLP
     220 W. Gutierrez Street
3    Santa Barbara, CA 93101
     Telephone:     (805) 898-9700
4    Facsimile:      (805) 852-2495

5    Counsel for the Miller Marital Deduction Trust,
     by and through its trustees, Helen Miller and
6    James Morris; and Helen Miller

7

8                  UNITED STATES DISTRICT COURT

9                 EASTERN DISTRICT OF CALIFORNIA

10                  SACRAMENTO DIVISION

11

12    MILLER MARITAL DEDUCTION TRUST,      Case No. 2:16-cv-01883-SB
     by and through its trustees, Helen Miller and
13    James Morris; and HELEN MILLER, an       MEMORANDUM OF POINTS AND
     individual,                               AUTHORITIES IN SUPPORT OF MILLER
14                                     MARITAL DEDUCTION TRUST AND
                    *Plaintiffs,*          HELEN MILLER'S OPPOSITION TO
15                                      ESTATE OF JACK MILLER, DECEASED'S
               v.                        MOTION FOR SUMMARY JUDGMENT
16
     ESTATE OF MARK B. DUBOIS,           WITH ORAL ARGUMENT
17    DECEASED, an individual and dba Glo Dry
     Cleaning System, *et al.*,            Judge Stanley A. Bastian
18
                   *Defendants.*      Action filed: August 10, 2016
19                                       Discovery cut-off: January 2, 2018
     ───────────────────────────    Trial date: May 21, 2018
20

21    AND RELATED CROSS-ACTIONS.

22

23

24

25

26

27



28

# TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................................. 1

II.    STATEMENT OF FACTS .................................................................................. 2

  A.   Ownership history of the property........................................................... 2

  B.   Ownership and operational history of Glo Dry Cleaning System .................. 2

  C.   The Contamination ................................................................................. 3

  D.   The Insurers' Policies ............................................................................ 3

III.   PROCEDURAL HISTORY ................................................................................ 4

IV.    ISSUES PRESENTED ....................................................................................... 5

V.     LEGAL STANDARDS ...................................................................................... 5

VI.    ARGUMENT ...................................................................................................... 7

  A.   The issue of the Insurers' duty to indemnify its insured is not ripe given that the insured has not been found liable. ................................................................... 7

  B.   The Insurers bear the burden to prove their coverage defense in this California Probate Code §§ 550–555 action. .................................................................. 8

  C.   As a defendant moving for summary judgment on an affirmative defense, it is the Insurers' burden to prove non-coverage as a matter of law. ....................... 13

  D.   The Insurers failed to prove as a matter of law that no "sudden and accidental" releases contributed to the contamination.......................................................... 13

  E.   A genuine issue of material fact exists as to whether "sudden and accidental" releases contributed to the contamination................................................................. 15

    1.  Written Discovery ................................................................................ 20

    2.  Percipient Witnesses............................................................................ 22

    3.  Expert Witnesses ................................................................................. 23

VII.   CONCLUSION ................................................................................................. 26



MEMORANDUM IN OPPOSITION TO INSURERS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

## CASES

*Aggio v. Estate of Aggio*, No. C 04-4357 PJH, 2008 U.S. Dist. LEXIS 49368 (N.D. Cal. Jun. 19, 2008) ...................................................................................................11

*American States Ins. Co. v. Sacramento Plating, Inc.*, 861 F. Supp. 964 (E.D. Cal. 1994) .........................................................................................................................18

*Amwest Surety Ins. Co. v. Wilson*, 11 Cal. 4th 1243 (1995) ...........................................9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................6

*AT&T Corp. v. MRO Communs., Inc.*, No. 98-17348, 1999 U.S. App. LEXIS 32515 (9th Cir. Dec. 13, 1999) .....................................................................................13

*Aydin Corp. v. First State Ins. Co.,* 18 Cal. 4th 1183 (1998)..........................11, 12, 14

*Bona Fide Conglomerate, Inc. v. SourceAmerica*, No. 3:14-cv-00751-GPC-AGS, 2017 U.S. Dist LEXIS 116329 (S.D. Cal. July 24, 2017)......................................21

*Cal. Dept. of Toxic Subs. Control v. Interstate Non-Ferrous Corp.,* 298 F. Supp. 2d 930 (E.D. Cal. 2003) ...........................................................................................7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................5, 6, 24

*Certain Underwriters at Lloyd's of London v. Superior Court,* 24 Cal. 4th 945 (2001) ........................................................................................................................7

*Clark v. Travelers Cas. Ins. Co. of Am.,* No. CV 14-08248 DDP (PJWx), 2015 WL 5096418 (C.D. Cal. Aug. 28, 2015) .........................................................................7

*County of Stanislaus v. Travelers Indem. Co.,* 142 F. Supp. 3d 1065 (E.D. Cal. 2015) ........................................................................................................................7

*Escobedo v. Estate of Snider*, 14 Cal. 4th 1214 (1997).............................................8, 9

*Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534 (6th Cir. 2001)......................................................................................23

*Freedman v. United States*, No. 02-21060-CIV-UNGARO-BENAGES, 2003 U.S. Dist. LEXIS 3815 (S.D. Fla. Feb. 24, 2003)................................................................6

*Hanline v. Cnty. of Ventura*, No. CV 15-8808-VAP (AJWx), 2016 U.S. Dist.



MEMORANDUM IN OPPOSITION TO INSURERS' MOTION FOR SUMMARY JUDGMENT

LEXIS 83355 (C.D. Cal. June 8, 2016) ...................................................... 10

*Houghton v. South*, 965 F.2d 1532 (9th Cir. 1992) .................................... 13

*Imposs. Elecs. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026
(5th Cir. 1982) ............................................................................................ 7

*Johnson v. Bradley*, 4 Cal. 4th 389 (1992) ................................................. 9

*Kanne v. Connecticut General Life Ins. Co.*, 867 F.2d 489 (9th Cir. 1988) ............................... 8

*Keating v. Jones Dev. of Mo., Inc.*, 398 F.2d 1011 (5th Cir. 1968) .................. 7

*Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.*, 420 F.2d 1211 (5th
Cir. 1969) ................................................................................................... 6

*Miller v. Pezzani (In re Worlds of Wonder Sec. Litig.)*, 35 F.3d 1407 (9th Cir.
1994) .......................................................................................................... 6

*Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287 (1993) .................. 7

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Seagate Techs., Inc.*, 466 F. App'x
653 (9th Cir. 2012) ..................................................................................... 7

*Niagara Mohawk Power Corp. v. Chevron USA, Inc.*, 596 F.3d 112 (2d Cir. 2010) ................ 23

*Niemeyer v. Ford Motor Co.*, No. 2:09-cv-02091-JCM-PAL, 2012 U.S. Dist.
LEXIS 4849 (D. Nev. Jan. 17, 2012) ....................................................... 24

*Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916 (9th Cir. 2004) ..................... 6

*People v. Alvarez*, 27 Cal. 4th 1161 (2002) ................................................. 9

*People v. Gilbert*, 1 Cal. 3d 475 (1969) ....................................................... 9

*People v. Toro*, 47 Cal. 3d 966 (1989) ......................................................... 9

*Provenz v. Miller*, 102 F.3d 1478 (9th Cir. 1996) ........................................ 6

*Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658 (2003) .......... 12

*SMDA v. American Ins. Co.*, 572 N.W.2d 686 (Mich. Ct. App. 1997) .......... 20

*Smith v. Hughes Aircraft Co.*, 22 F.3d 1432, 1438 (9th Cir. 1993) .......... 17, 18

*Southern Cal. Gas Co. v. City of Santa Ana,* 336 F.3d 885 (9th Cir. 2003) ............ 6

*State of California v. Allstate*, 45 Cal. 4th 1008 (2009) ........................ 7, 14, 19, 20

*State of California v. Continental Ins. Co.*, 55 Cal. 4th 186 (2012) .......... 4, 14



*Travelers Casualty & Surety Co. v. Superior Court*, 63 Cal. App. 4th 1460 (1998)............20, 26

*United States v. Johnson,* 256 F.3d 895 (9th Cir. 2001) ................................................................9

*Varlen Corp. v. Liberty Mut. Ins. Co.*, No. 13-cv-05463, 2017 U.S. Dist. LEXIS

   162110 (N.D. Ill. Sept. 25, 2017).................................................................................26

**STATUTES**

Cal. Evid. Code § 500 ..............................................................................................................10

Cal. Prob. Code § 550 ................................................................................................................8

Cal. Prob. Code § 552 ................................................................................................................8

Cal. Prob. Code § 553 ....................................................................................................8, 10, 11

**OTHER AUTHORITIES**

*Recommendation Relating to Litigation Involving Decedents*, 19 Cal. L. Revision

   Comm'n Reports 899 (1988) ....................................................................................10

**RULES**

Fed. R. Civ. P. 26 ................................................................................................................24, 25

Fed. R. Civ. P. 56(a)...................................................................................................................5

Fed. R. Civ. P. 56(c)...................................................................................................................6

**TREATISES**

8-134 Moore's Federal Practice – Civil § 134.02 (2018) .........................................................11



MEMORANDUM IN OPPOSITION TO INSURERS' MOTION FOR SUMMARY JUDGMENT

## I.   INTRODUCTION

Defendant Estate of Jack Miller, Deceased ("Jack Miller") represented by Allianz Insurance Company and Zurich American Insurance Company (collectively, the "Insurers") has moved for summary judgment on its Thirty-First Affirmative Defense, that "coverage for Jack Miller may be barred … to the extent that the claims in the Complaint seek damages or other relief for bodily injury or property damage out of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere, or any water course or body of water that was not sudden and accidental." The Insurers contend that Plaintiffs have no evidence of a "sudden and accidental" release which would bring their claims against Insurers' insured within coverage, and that the Insurers are therefore entitled to judgment on those claims as a matter of law.

The Insurers' summary judgment motion should be denied. First, under California law, the question of whether an insurer has a duty to indemnify its insured on a particular claim is ripe for consideration only if the insured has already incurred liability on that claim. Here, given that the decedent-insured, Jack Miller, has yet to be held liable, the question of whether that liability is covered by insurance is not yet ripe. Second, even if the issue of insurance coverage were ripe, it is not Plaintiffs' burden to prove coverage. Rather, as a defendant moving for summary judgment on an affirmative defense and as an insurer in an action under California Probate Code §§ 550–555, it is the Insurers' burden to prove non-coverage, and the Insurers failed to meet that burden. They failed to prove as a matter of law that no "sudden and accidental" releases contributed to the contamination at issue in this action. Third, even if the Insurers had met their burden, and even if the burden had shifted to Plaintiffs to demonstrate a genuine issue of material fact, Plaintiffs have met that burden with their submission herewith of significant circumstantial and expert opinion evidence that "sudden and accidental" releases contributed substantially to the contamination here. Evidence that there are extremely high levels of dry-cleaning solvent in the shallow soil directly underneath the area where the dry-cleaning equipment was located, that there is no evidence of non-sudden or non-accidental releases of dry-cleaning solvent, that there is a high frequency within the dry-cleaning industry of "sudden and accidental" releases at similarly-situated dry-cleaning

**MEMORANDUM IN OPPOSITION TO INSURERS' MOTION FOR SUMMARY JUDGMENT**

1  facilities, that dry-cleaning solvent is expensive and not typically released intentionally, and the

2  destruction and removal of the concrete slab at Jack Miller's direction at a minimum gives rise, to

3  a genuine issue of material fact as to whether "sudden and accidental" releases contributed

4  substantially to the contamination. Accordingly, the Insurers' motion for summary judgment should

5  be denied.

6  ## II.    STATEMENT OF FACTS

7  **A.    Ownership history of the property**

8       The Miller Marital Deduction Trust is the current owner of the real property located at 6045

9  Pacific Avenue in Stockton, California (the "Property").[1] The previous owner was Jack Miller, who

10  owned the Property from 1970 until 1989, when it was put into the Miller Family Trust.[2] Upon

11  Jack Miller's death in 2002, the Property was transferred from the Miller Family Trust into the

12  Miller Marital Deduction Trust.[3] James Morris and Helen Miller are co-trustees of the Miller

13  Marital Deduction Trust.[4] (Plaintiffs and Counter-defendants Helen Miller, as an individual, and

14  the Miller Marital Deduction Trust, by and through its trustees James Morris and Helen Miller, are

15  collectively referred to herein as the "Miller Trust.")

16  **B.    Ownership and operational history of Glo Dry Cleaning System**

17       Between approximately 1956 and 1985, a dry-cleaning business named Glo Dry Cleaning

18  System ("Glo Dry Cleaning") operated on the Property.[5] The DuBoises were the original owners

19  and operators of Glo Dry Cleaning,[6] followed by the Rubys and then the Van Gorps.[7] Dorothy and

20

21       [1] *See* Declaration of Bret A. Stone in Support of Miller Trust's Opposition to ICW's Motion for Summary Judgment ("Stone Decl."), filed herewith, at ¶ 3. Statement of Undisputed Facts in Support of Defendant Estate of Jack Miller, Deceased, *ex rel.* Insurance Company of the West's Motion for Summary Judgment ("SUF") No. 2.

22

23       [2] *See* Stone Decl. at ¶ 2; Request for Judicial Notice in Support of Miller Trust's Opposition to ICW's Motion for Summary Judgment ("RJN"), filed herewith, at ¶ 6, Exh. 6.

24       [3] *See* Stone Decl. at ¶ 2; RJN at ¶ 6, Exh. 6.

25       [4] *See* Stone Decl. at ¶ 3.

26       [5] *See* Declaration of Alborz Wozniak in Support of Miller Trust's Opposition to ICW's Motion for Summary Judgment ("Wozniak Decl."), filed herewith, at ¶ 4, Exh. 1 at p. 3-5.

27       [6] *See* Stone Decl. at ¶ 15, Exh. 11 at 9:16-18; 12:9-11.

28       [7] *See* Stone Decl. at ¶ 23, Exh. 19.



Richard Calhoun purchased Glo Dry Cleaning from the Van Gorps in 1981.[8] Jack Miller leased the Property to the Van Gorps and Calhouns with the knowledge and express purpose of having a dry cleaner on the Property.[9]

**C.    The Contamination**

In 2015, the Miller Trust attempted to sell the Property to a third party.[10] After conducting a Phase II environmental assessment as part of the due diligence, the sale of the Property fell through due to the discovery of the dry-cleaning solvent perchloroethylene ("PCE"), and its breakdown chemicals in the soil and soil vapor at the Property.[11] Upon further investigation, the Miller Trust discovered that the contamination expanded beyond the confines of the Property and is impacting adjacent and downgradient properties (the "Site").[12] Currently, the extent of the groundwater contamination plume, soil impacts, and vapor intrusion still need to be completely characterized and defined.[13] However, the current environmental data shows extremely high levels of PCE and its breakdown chemicals in the shallow soil where the dry cleaning operations took place.[14] The contamination has spread off the Property in groundwater and is currently causing significant concerns as to indoor air quality for neighboring businesses and residences.[15]

**D.    The Insurers' Policies**

Allianz and Zurich issued insurance policies to Jack Miller.[16] The first Zurich policy was effective from January 11, 1977 to January 11, 1980; the second from January 11, 1980 to January 11, 1983; and the third from January 11, 1983 to January 11, 1984.[17] Allianz issued a policy

---

[8] *See* Wozniak Decl. at ¶ 4, Exh. 1 at p. 3-5.

[9] *See* Stone Decl. at ¶ 10, Exh. 6 at 43:13-15.

[10] *See* Wozniak Decl. at ¶ 4, Exh. 1 at p. 3-5.

[11] *See* Wozniak Decl. at ¶ 4, Exh. 1 at p. 3-5.

[12] *See* Wozniak Decl. at ¶ 5.

[13] *See* Wozniak Decl. at ¶ 11.

[14] *See* Wozniak Decl. at ¶ 10.

[15] *See* Wozniak Decl. at ¶ 11.

[16] *See* Statement of Undisputed Facts in Support of Defendant Estate of Jack Miller, Deceased,'s Motion for Summary Judgment ("SUF") No. 6.

[17] SUF No. 2.



effective from January 11, 1985 to January 11, 1986.[18] Coverage exists under these policies for "all sums which the insured shall become legally obligated to pay as damages because of . . . property damage caused by an occurrence to which this insurance applies."[19] An "occurrence" is defined in the policies as "an accident including continuous or repeated exposure to conditions, which results in . . . property damage neither expected nor intended from the standpoint of the insured. . . ."[20] The occurrence can happen any time before or during the policy period; only the property damage that the occurrence causes must occur during the policy period.[21] Finally, the Insurers' policies exclude coverage for "property damage arising out of the discharge, dispersal, release or escape of . . . irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental."[22]

### III.    PROCEDURAL HISTORY

The Miller Trust filed its initial Complaint in this action on August 10, 2016, and its First Amended Complaint on September 12, 2017.[23] In both complaints, the Estate of Richard Calhoun, Deceased, was named as a defendant to the extent of his estate's insurance assets pursuant to California Probate Code §§ 550–555 to establish the decedent's liability for which he was protected by liability insurance policies.[24] The Insurers timely filed the present summary judgment motion.[25] With that motion, the Insurers seek summary judgment on their Thirty-First Affirmative Defense, that "coverage for Jack Miller may be barred … to the extent that the claims in the Complaint seek damages or other relief for bodily injury or property damage out of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste

---

[18] SUF Nos. 6, 7.

[19] *See* Stone Decl. at ¶ 12, Exh. 8.

[20] SUF No. 10.

[21] *State of California v. Continental Ins. Co.*, 55 Cal. 4th 186, 196 (2012).

[22] SUF No. 9.

[23] ECF Nos. 1, 34.

[24] *Id.*

[25] ECF No. 62.

materials or other irritants, contaminants or pollutants into or upon land, the atmosphere, or any water course or body of water that was not sudden and accidental."[26] The Insurers contend that the Miller Trust has no evidence of a "sudden and accidental" release which would bring its claims against the Insurers' insured within coverage, and that the Insurers are therefore entitled to judgment on those claims as a matter of law.[27] This is the Miller Trust's timely response to the Insurers' summary judgment motion.

## IV.    ISSUES PRESENTED

The Insurers' summary judgment motion presents the Court with the following issues to address:

(1)    Is the question of the Insurers' duty to indemnify ripe?[28]

(2)    If so, who has the burden of proof on that question in the context of the Insurers' motion for summary judgment? Must the Insurers prove as a matter of law that no "sudden and accidental" releases contributed to the contamination in order to obtain summary judgment in its favor? Or, is it the Miller Trust's burden to prove that a genuine issue of material fact exists as to whether such a release contributed to the contamination in order to defeat the Insurers' summary judgment motion?

(3)    Did the parties meet their respective burdens of proof?

## V.    LEGAL STANDARDS

Summary judgment is properly entered on each claim on which summary judgment is sought where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[29] A dispute is genuine if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the opposing party, and a dispute is "material" if it could affect

---

[26] Memorandum of Points and Authorities in Support of Defendant Estate of Jack Miller, Deceased's Motion for Summary Judgment ("Motion") at 1:2-4. All citations herein to page numbers are to the internal page numbers at the bottom of pages, not to the CM/ECF-generated page numbers at the top of pages.

[27] *Id.*

[28] *See* Insurers' Motion at 1:4-7 ("The claims by plaintiffs … are barred by the pollution exclusion in Jack Miller's insurance policies.").

[29] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).



MEMORANDUM IN OPPOSITION TO INSURERS' MOTION FOR SUMMARY JUDGMENT

the outcome of the suit under governing law.[30] Where the moving party has the burden of persuasion at trial, they must establish "beyond controversy every essential element" of their claim.[31]

On a motion for summary judgment, the opposing party must direct the court's attention to specific, triable facts by "citing to particular parts of materials in the record."[32] A party may submit affidavits or declarations, among other evidence, to oppose a motion, and the opposing admissible evidence presented must be sufficiently probative to permit a reasonable trier of fact to find in favor of the opposing party.[33] Any evidence only needs to be admissible at trial; it does not need to be admissible at the time the motion is made.[34] All reasonable inferences must be drawn in the light most favorable to the non-moving party.[35]

Generally, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case.[36] However, a nonmoving party cannot overcome summary judgment by merely providing conclusory allegations by an expert.[37]

Additionally, if the record on a motion for summary judgment presents factual issues, the court must not decide them; it must deny the motion and proceed to trial.[38] Moreover, "[s]ummary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about

---

[30] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

[31] *See Southern Cal. Gas Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003).

[32] Fed. R. Civ. P. 56(c)(1)(A).

[33] Fed. R. Civ. P. 56(c)(4); *Liberty Lobby*, 477 U.S. at 249-50.

[34] *Celotex,* 477 U.S. at 324.

[35] *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

[36] *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996) (quoting *Miller v. Pezzani (In re Worlds of Wonder Sec. Litig.)*, 35 F.3d 1407, 1425 (9th Cir. 1994)).

[37] *Id.*

[38] *Freedman v. United States*, No. 02-21060-CIV-UNGARO-BENAGES, 2003 U.S. Dist. LEXIS 3815, at *6 (S.D. Fla. Feb. 24, 2003).

the inferences that should be drawn from these facts."[39] "If reasonable minds might differ on the inferences arising from undisputed facts then the Court should deny summary judgment."[40]

## VI.    ARGUMENT

**A.    The issue of the Insurers' duty to indemnify its insured is not ripe given that the insured has not been found liable.**

The Insurers' summary judgment motion should be denied as premature since the decedent-insured, Jack Miller, has not yet been found liable for any amount which his insurers would be required to indemnify. The duty to indemnify only arises once the insured is found liable for a judgment.[41] Where no judgment has been issued and the underlying litigation is ongoing, it is premature for a court to issue a determination as to the duty of indemnification.[42] This is consistent with general California insurance law principles as well as the more specific situation this case falls within where a third party is suing a decedent pursuant to California Probate Code § 550 in order to recover insurance proceeds to remediate contaminated property.[43] For example, courts generally render a decision on CERCLA liability prior to deciding whether or not there were applicable insurance liability defenses.[44] In fact, the California Supreme Court has essentially made the liability determination a requirement prior to determining coverage for "sudden and accidental" pollution exclusions.[45] Therefore, insurance coverage defenses are not at issue unless and until an insured is found liable.

---

[39] *Id.* (citing *Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969)).

[40] *Id.* (citing *Imposs. Elecs. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982)); *Keating v. Jones Dev. of Mo., Inc.*, 398 F.2d 1011, 1013 (5th Cir. 1968).

[41] *Certain Underwriters at Lloyd's of London v. Superior Court,* 24 Cal. 4th 945, 958 (2001) (duty to indemnify can only arise after liability is established and damages are fixed in their amount.).

[42] *See Clark v. Travelers Cas. Ins. Co. of Am.,* No. CV 14-08248 DDP (PJWx), 2015 WL 5096418, at *3 (C.D. Cal. Aug. 28, 2015); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Seagate Techs., Inc.,* 466 F. App'x 653, 656 (9th Cir. 2012).

[43] *See Montrose Chem. Corp. v. Superior Court,* 6 Cal. 4th 287, 301 (1993).

[44] *See Cal. Dept. of Toxic Subs. Control v. Interstate Non-Ferrous Corp.,* 298 F. Supp. 2d 930, 957 (E.D. Cal. 2003); *County of Stanislaus v. Travelers Indem. Co.,* 142 F. Supp. 3d 1065, 1075 (E.D. Cal. 2015).

[45] *See State of California v. Allstate*, 45 Cal. 4th 1008, 1029 (2009) (the causation of the third party



MEMORANDUM IN OPPOSITION TO INSURERS' MOTION FOR SUMMARY JUDGMENT

**B.** **The Insurers bear the burden to prove their coverage defense in this California Probate Code §§ 550–555 action.**

The Miller Trust sued the Estate of Jack Miller, Deceased under California Probate Code §§ 550–555. These statutes set forth the procedure for litigation against a decedent for recovery from the decedent's insurance assets. More specifically, under § 550, an action to establish a decedent's liability for which the decedent was protected by insurance may be commenced or continued against the decedent's estate without the need to join as a party the decedent's personal representative or successor in interest.[46] The summons for the complaint is then served on the decedent's insurer and the action continues in the name of the estate.[47] The insurer may then deny its liability in the action or in an independent action.[48] This denial of liability is treated as an affirmative defense for the insurer, which puts the burden of proof on the insurer to show lack of coverage.[49]

The Insurers cite *Escobedo v. Estate of Snider* for the proposition that the plaintiff must show insurance coverage.[50] This statement relied on, however, was *dicta* and not binding on this Court. In *Escobedo*, the plaintiff sued the decedent's estate pursuant to Probate Code §§ 550–555 and attempted to show the existence of an aviation insurance policy by showing that no notification of cancellation existed at the department of transportation, which was required by statute. The issue in the case was "whether an insurance policy for aircraft liability, which the insurer deemed canceled for lack of premium payment, was continued in force, beyond the purported cancellation date, under a provision of [California Uniform Aircraft Financial Responsibility Act] CUAFRA stating that certain aircraft liability policies may not be canceled without 30 days' prior notice to

---

liability is needed to determine if there is coverage in the first party insurance context).

[46] Cal. Prob. Code § 550(a).

[47] Cal. Prob. Code § 552(a).

[48] Cal. Prob. Code § 553.

[49] *Kanne v. Connecticut General Life Ins. Co.*, 867 F.2d 489, 492 (9th Cir. 1988) (defendant bears burden of proof on its affirmative defenses).

[50] 14 Cal. 4th 1214, 1217 (1997).



MEMORANDUM IN OPPOSITION TO INSURERS' MOTION FOR SUMMARY JUDGMENT

1   the California Department of Transportation (hereafter the department)."[51] The Court held that the

2   CUAFRA provision at issue "applies only to the cancellation of insurance policies that have, before

3   cancellation, been proffered to the department to show financial responsibility after an accident."[52]

4   Nothing in the Court's analysis of the issue discussed any aspect of insurance coverage or the

5   burden of proof under Cal. Probate Code §§ 550-555. Rather, the Court simply engaged in statutory

6   analysis to determine the meaning of the CUAFRA statute. The Court did not discuss the burden

7   of proof in an action under Probate Code §§ 550–555 except for one sentence at the end of the

8   decision where the Court applied the statutory interpretation it reached to the facts of the case.[53]

9   That sentence simply stated that plaintiff had the burden of proving coverage and failed to meet

10  that burden when it failed to provide evidence that the insurance policy at issue was filed with the

11  department and therefore fell within the statutory provision at issue.[54]

12       Under California law, where a previous decision has not confronted the precise issue, "it is

13  axiomatic that cases are not authority for propositions not considered."[55] Additionally, in the Ninth

14  Circuit, "not every statement of law in every opinion is binding on later panels. Where it is clear

15  that a statement is made casually and without analysis, where the statement is uttered in passing

16  without due consideration of the alternatives, or where it is merely a prelude to another legal issue

17  that commands the panel's full attention, it may be appropriate to revisit the issue in a later case."[56]

18  Thus, the statement from *Escobedo*, "made casually and without analysis," where the proposition

19  at issue here, the burden of proof under Cal. Probate Code §§ 550-555, was not considered, does

20  not have precedential value and this Court need not follow it

21       [51] *Escobedo*, 14 Cal. 4th at 1217.

22       [52] *Escobedo*, 14 Cal. 4th at 1227-28.

23       [53] *Escobedo*, 14 Cal. 4th at 1228.

24       [54] *Escobedo*, 14 Cal. 4th at 1228.

25       [55] *People v. Alvarez*, 27 Cal. 4th 1161, 1176 (2002) (citing *People v. Toro,* 47 Cal. 3d 966, 978, n.7 (1989)); *People v. Gilbert*, 1 Cal. 3d 475, 482, n.7 (1969); *see also Amwest Surety Ins. Co. v. Wilson*, 11 Cal. 4th 1243, 1268 (1995); *Johnson v. Bradley*, 4 Cal. 4th 389, 415 (1992) (Mosk, J., concurring and dissenting).

27       [56] *United States v. Johnson,* 256 F.3d 895, 915 (9th Cir. 2001); *see id.,* at n.9 ("[W]e measure[] dicta based on whether the earlier panel intended to decide the issue, not whether the discussion was logically necessary to the earlier disposition.") (Kozinsky, C.J., concurring).

28

Not only was the statement *dicta*, it ignored the clear statutory language of § 553, which provides that non-coverage may be raised as an affirmative defense by the insurer. Specifically, "[a]n insurer may *deny* or otherwise contest its liability in an action under this chapter or *by an independent action*."[57] This language clearly requires an insurer, who wishes to deny coverage for the decedent-insured's liability, to do so as an affirmative defense in the Probate Code §§ 550–555 action or, if it prefers, in an independent coverage action by the plaintiff-judgment creditor against the insurer. Indeed, the California Law Revision Commission, which drafted the language for Probate Code § 553, and was then adopted by the California legislature, titled that section "Defenses."[58] Under the California Evidence Code § 500, "a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense he is asserting." The California legislature was aware of this evidentiary statute when they passed Probate Code § 553 so they intentionally put the burden of proof on the insurer when the legislature made coverage an affirmative defense.

The Insurers also cite *Hanline v. County of Ventura* for the proposition that the plaintiff is required to prove coverage in Probate Code §§ 550–555 action.[59] In *Hanline*, the plaintiff sued the estate of a police officer for various constitutional violations.[60] However, the plaintiff did not plead sufficient facts to show that the police officer was protected by insurance.[61] Therefore, the court dismissed the case on a motion to dismiss.[62] Like *Escobedo*, *Hanline* provides no analysis as to why the burden of proof ought to be on the plaintiff when it is clearly an affirmative defense of the insurer.[63] Moreover, the *Escobedo* and *Hanline* decisions are cases where the plaintiff failed to even prove the existence of an insurance policy unlike the matter at hand where the insurance

---

[57] Cal. Prob. Code § 553 (emphasis added).

[58] *See Recommendation Relating to Litigation Involving Decedents*, 19 Cal. L. Revision Comm'n Reports 899, 909 (1988).

[59] *Hanline v. Cnty. of Ventura*, No. CV 15-8808-VAP (AJWx), 2016 U.S. Dist. LEXIS 83355, at *8 (C.D. Cal. June 8, 2016).

[60] *Hanline*, 2016 U.S. Dist. LEXIS 83355,  at *2.

[61] *Id.* at *8.

[62] *Id.* at *8.

[63] *Id.* at *8.



MEMORANDUM IN OPPOSITION TO INSURERS' MOTION FOR SUMMARY JUDGMENT

policies are part of the record and the terms and conditions are known. Therefore, *Escobedo* and *Hanline* at most put the burden on the plaintiff to prove the existence, terms, and conditions of the insurance policies. Under Probate Code § 553, it is the affirmative burden of the Insurers to show that its known and admitted insurance policies do not provide coverage for the liability of the decedent-insured.

Additionally, the Insurers cite *Aggio v. Estate of Aggio* for the proposition that the plaintiff in an action under Probate Code §§ 550–555 carries the burden of proof on coverage.[64] In that case, the district court did look at the terms and conditions of the insurance policy when ruling that there was no coverage.[65] But again, as in *Escobedo* and *Hanline*, the court provided no legal analysis on the burden of proof issue.[66] In any event, *Hanline* and *Aggio* are district court cases; their rulings are not binding on this Court.[67]

The Insurers then cite *Aydin Corp. v. First State Ins. Co.* for the general proposition that once an insurance company proves that a pollution exclusion applies, it is the insured's burden to prove that the sudden and accidental exception applies.[68] *Aydin*, however, was not a Probate Code §§ 550–555 action and its reasoning in such an action does not withstand scrutiny. First, the Miller Trust is not an insured under the policy. This distinction is important as the court in *Aydin* reasoned that the insured should bear the burden of proving the sudden and accidental exception to the pollution exclusion because of the insured's superior knowledge. Here, the Miller Trust, an innocent third-party, does not have knowledge as to the acts of Jack Miller so there is no superior knowledge.[69] Helen Miller testified that she has no knowledge about her deceased husband's actions with respect to the Property, only having visited there once with him.[70]

---

[64] *Aggio v. Estate of Aggio*, No. C 04-4357 PJH, 2008 U.S. Dist. LEXIS 49368, at *12 (N.D. Cal. Jun. 19, 2008).

[65] *Id.* at *15-21.

[66] *Aggio*, 2008 U.S. Dist. LEXIS 49368, at *15.

[67] *See* 18-134 Moore's Federal Practice – Civil § 134.02 (2018).

[68] See Insurers' Motion at p. 10, n.35 (citing *Aydin Corp. v. First State Ins. Co.,* 18 Cal. 4th 1183, 1188 (1998)).

[69] *Aydin*, 18 Cal. 4th at 1194.

[70] See Stone Decl. at ¶ 13, Exh. 9 at 34:1-11.



MEMORANDUM IN OPPOSITION TO INSURERS' MOTION FOR SUMMARY JUDGMENT

1    Secondly, the *Aydin* Court discussed whether the burden of proof for the sudden and

2    accidental exception ought to be placed on the insurer.[71] Although the Court decided not to put the

3    burden on the insurer in that case, the reasoning is illustrative for why it ought to be placed on the

4    insurer in a case under Probate Code §§ 550–555. The Court in *Aydin* identified several factors to

5    be considered on the burden of proof issue, including "the knowledge of the parties concerning the

6    particular fact, the availability of the evidence to the parties, the most desirable result in terms of

7    public policy in the absence of the particular fact, and the probability of the existence or

8    nonexistence of the fact."[72] In a § 550 action, the plaintiff is unlikely to have knowledge about a

9    particular fact whereas the insurer may have further knowledge of a fact through investigations

10   conducted during the policy period in addition to any representation made by the insured to the

11   insurer.[73] Additionally, the insurer would have greater access to the evidence than the plaintiff who

12   may not have any knowledge of the insured's activities. As for the most desirable result in terms of

13   public policy in the absence of a particular fact, the *Aydin* court noted California's strong public

14   policy "to prevent, eliminate, and reduce pollution."[74] California also has a strong public policy in

15   protecting the health of its citizens. If the plaintiff in a Probate Code §§ 550–555 action is held to

16   the same standard of an insured under *Aydin*, this would thwart the public policy of reducing

17   pollution as there would be no incentive for a plaintiff to attempt to obtain insurance assets in order

18   to clean up contaminated property despite the insurance coverage having been paid for by the

19   insured.[75] Additionally, it would thwart California's policy of protecting the public health. Lastly,

20   the probability of the existence or nonexistence of the fact can be best be determined by the insurer

21   _____

22   [71] *Aydin,* 18 Cal. 4th at 1193.

     [72] *Aydin,* 18 Cal. 4th at 1193.

23
24   [73] For example, Zurich American Insurance Company was able to provide detailed diagrams of the
     location of the dry-cleaning equipment from their underwriting file, information which the Miller Trust had
     been unable to find. *See* Stone Decl. at ¶ 20, Exh. 16. Zurich also knew that PCE was being used as they had
25   records of it not being a fire hazard. *Id.*

     [74] *Aydin,* 18 Cal. 4th at 1193.
26
     [75] *See Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1673 (2003) ("exceptions to the
27   general rule placing the burden of proof for prima facie elements on defendants are made when it is otherwise
     impossible for the plaintiff to make its case, and when policy considerations support affording the plaintiff
28   greater protection.")

1   in a Probate Code §§ 550–555 action as it would be more familiar with the actions of the insured

2   during the policy period than the plaintiff.[76] Therefore, *Aydin*'s holding should not apply in a

3   Probate Code §§ 550–555 action as the burden of proof better rests with the insurer than the third

4   party suing the insurer.

5   **C.   As a defendant moving for summary judgment on an affirmative defense, it is the**

6   **Insurers' burden to prove non-coverage as a matter of law.**

7   The Insurers are moving for summary judgment on their Thirty-First Affirmative Defense:

8   Pollution Exclusion.[77] A defendant has the burden of proof at trial on an affirmative defense.[78]

9   Therefore, as the moving party with the burden of proof at trial, the Insurers must establish that the

10   pollution exclusion applies and that no "sudden and accidental" releases occurred at Glo Dry

11   Cleaning. Therefore, for it to prevail on its summary judgment motion, the Insurers must prove as

12   a matter of law, *i.e.,* conclusively, that no "sudden and accidental" releases contributed to the

13   contamination at issue in this action.

14   **D.   The Insurers failed to prove as a matter of law that no "sudden and accidental" releases**

15   **contributed to the contamination.**

16   As a defendant moving for summary judgment on an affirmative defense and as an insurer in

17   an action under Probate Code §§ 550–555, the Insurers have the burden to conclusively prove non-

18   coverage, as discussed above, and the Insurers failed to meet that burden.  Before turning to that

19   evidence, however, it is important for the Court to understand what a "sudden and accidental"

20   release is and when it must occur for there to be coverage under an insurance policy.

21   Because the qualified pollution exclusion[79] is an exclusion to coverage, it must be broadly

22   —————————————

23   [76] *See* Stone Decl. at ¶ 20, Exh. 16. Zurich American Insurance Company was able to provide detailed
diagrams of the location of the dry-cleaning equipment from their underwriting file, information which the

24   Miller Trust had been unable to find. Zurich also knew that PCE was being used as they had records of it
not being a fire hazard. *Id.*

25   [77] *See* Motion at 1:1-6; ECF No. 48 at p. 24.

26   [78] *See AT&T Corp. v. MRO Communs., Inc.*, No. 98-17348, 1999 U.S. App. LEXIS 32515, at *10
(9th Cir. Dec. 13, 1999) (citing *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

27   [79] Policies, like the Allianz and Zurich American policies, that exclude coverage for pollution except
when it results from a "sudden and accidental" release are said to contain a "qualified pollution exclusion."

28   This is in contrast to an "absolute pollution exclusion," which excludes coverage for all pollution regardless



construed in favor of the insured.[80] In order for a release to be considered "sudden and accidental," two things must be shown.[81] First, the event must be temporally limited; the release cannot be gradual or constant.[82] Second, the release must have been unexpected or unintended.[83] In addition, the "sudden and accidental" release must cause property damage during the policy period at issue.[84] The "sudden and accidental" release itself can occur at any time prior to or during the policy period, but there must be some resulting damage during the policy period.[85]

As discussed below, the Miller Trust can show that there was more likely than not a sudden and accidental release of pure PCE from Glo Dry Cleaning which operated from 1956 to 1985. Due to the migrating nature of the release, the property damage caused by it must have continued during the time period that the Insurers' policies were in effect even if the release took place prior to Jack Miller owning the Property. Furthermore, the Miller Trust can prove a sudden and accidental release occurred when the concrete slab under the dry-cleaning equipment was removed by Jack Miller. Therefore, the Insurers must cover this claim.

Here, the Insurers failed to prove as a matter of law that no "sudden and accidental" releases contributed to the contamination at issue in this action. In their Motion, the Insurers do not point to a single piece of evidence that conclusively shows that there were no "sudden and accidental" releases. Furthermore, the Insurers do not have any evidence showing that sudden and accidental releases contributed to the contamination. That the site is heavily contaminated with PCE is undisputed. The Insurers could have hired a forensic expert, for instance, to opine that the concentrations conclusively show that they came from slow drips or intentional dumping. They didn't do that. Instead, the Insurers chose to withdraw their expert witnesses.[86] Therefore, the

---

of whether or not it results from a "sudden and accidental" release.

[80] *See Aydin*, 18 Cal. 4th at 1192.

[81] *See Allstate*, 45 Cal. 4th at 1024.

[82] *See id.*

[83] *Continental Ins. Co.*, 55 Cal. 4th at 196.

[84] *Id.*

[85] *Id.*

[86] *See Stone Decl. at ¶ 27, Exh. 22.*

1   Insurers have failed to prove as a matter of law that no "sudden and accidental" releases occurred

2   at Glo Dry Cleaning and that Jack Miller was not responsible for a sudden and accidental release.

3   **E.     A genuine issue of material fact exists as to whether "sudden and accidental" releases**

4   **contributed to the contamination.**

5          Even if the Insurers had met their burden, and even if the burden had shifted to the Miller

6   Trust to demonstrate a genuine issue of material fact, the Miller Trust has met that burden with its

7   submission herewith of significant direct, circumstantial and expert opinion evidence that "sudden

8   and accidental" releases contributed substantially to the contamination here.

9          Here, as discussed below, evidence that there are high levels of dry-cleaning solvent in the

10  shallow soil directly underneath the area where the dry-cleaning equipment was located, that there

11  was at least one release of *pure* PCE at that location, that there is no evidence of non-sudden or

12  non-accidental releases, that there is a high frequency within the dry-cleaning industry of "sudden

13  and accidental" releases at similarly-situated dry-cleaning facilities, and that dry-cleaning solvent

14  is expensive and not typically released intentionally, that the concrete slab beneath the dry cleaning

15  equipment was permeated with dry-cleaning solvent and that the concrete slab was destroyed gives

16  rise, at a minimum, to a genuine issue of material fact as to whether "sudden and accidental"

17  releases contributed substantially to the contamination.

18          **1.   The destruction of the concrete slab was a "sudden and accidental" release.**

19          Due to the environmental contamination present at the Site, it is clear that there were releases

20  of PCE due to the dry-cleaning operations at Glo Dry Cleaning.[87] Any releases of PCE on the

21  concrete left PCE on and permeating through the concrete slab and the concrete slab itself became

22  contaminated. The destruction of the concrete slab released PCE into the environment. It is clear

23  that this release as classified as sudden and accidental as every action taken to break up and remove

24  the slab would be an unexpected and unintended release.

25          **2.   The releases at Glo Dry Cleaning System were sudden and accidental.**

26          There are a number of governmental studies which have addressed the issues arising from

27

28          [87] *See* Wozniak Decl. at 4, Exh. 1.



MEMORANDUM IN OPPOSITION TO INSURERS' MOTION FOR SUMMARY JUDGMENT

contamination caused by dry cleaners.[88] According to one study, at least 75% of dry cleaners have some level of contamination.[89] Another study addressed the various release mechanisms common to dry cleaners concluding that there are six common ones: equipment failure, equipment operation, equipment maintenance, solvent storage and transfer, discharges of dry cleaning wastes, and other spills and discharges.[90] That same study also found that the most common area contaminated by PCE from dry cleaning operations was the soil beneath the floor slab near where the dry-cleaning machines and equipment was located.[91] These findings are consistent with the environmental data obtained so far at the subject property.[92]

The environmental contamination has not yet been fully characterized, but the data that is available shows high levels of PCE contamination where the dry-cleaning equipment was located.[93] Specifically, the soil sampled at the back of the store, where the dry-cleaning equipment was located, has levels of PCE at a concentration of 1,700 milligrams/kilogram at a depth of one foot below ground level.[94] Additionally, the soil vapor measurements at the back of the store were 2,500,000 micrograms/meters$^3$.[95] That is orders of magnitude above the Environmental Screening Level set by the California Regional Water Quality Control Board for PCE for commercial properties (2,100 micrograms/meters$^3$) and for residential properties (240 micrograms/meters$^3$).[96] Accordingly, the data and expert witness declarations provide evidence that there was at least one spill of *pure* phase PCE at the Property during the dry-cleaning operation, not evidence of constant small spills containing small amounts of diluted PCE.[97] Since PCE was expensive, a spill of pure

---

[88] *See* Wozniak Decl. at ¶ 4, Exh. 1 at p. 15.

[89] *See* Wozniak Decl. at ¶ 4, Exh. 1 at p. 15; RJN at ¶ 3, Exh. 3.

[90] *See* Wozniak Decl. at ¶ 4, Exh. 1 at p. 15; RJN at ¶ 1, Exh. 1.

[91] *Id.*

[92] *See* Wozniak Decl. at ¶¶ 8-10.

[93] *See* Wozniak Decl. at ¶¶ 9, 11.

[94] *See* Wozniak Decl. at ¶ 4, Exh. 1 at p. 17

[95] *See* Wozniak Decl. at ¶ 4, Exh. 1 at p. 17.

[96] *See* RJN at ¶ 7, Exh. 7.

[97] See Wozniak Decl. at ¶ 10.



1   PCE would not be intentional; it would have to be accidental.[98]

2        Additionally, there is no evidence that the contamination was caused by non-sudden or non-

3   accidental releases. Eugene Gini, who operated the machines for two years while Mark DuBois

4   owned and operated the dry cleaners, claims no such releases occurred while he worked at Glo Dry

5   Cleaning and that Mr. DuBois would never have allowed such a release to occur because he was a

6   stickler for procedures.[99] Mark Calhoun also does not recall having to clean up any dampness or

7   spills while he worked at Glo Dry Cleaning for his father, Richard Calhoun.[100] This testimony

8   shows a complete lack of non-sudden or non-accidental releases at Glo Dry Cleaning since regular

9   employees would more likely than not recall having to regularly mop up, or otherwise clean up,

10  solvent around the dry cleaning equipment, if such releases had actually occurred. In contrast, there

11  is significant circumstantial evidence that dry cleaners in general have a number of release

12  mechanisms which are more likely than not to be considered "sudden and accidental" as defined

13  by case law. As discussed above, the release mechanisms identified by the study could mostly be

14  considered "sudden and accidental."[101] For example, dry cleaning equipment failure, found at 40%

15  of the sites, would likely happen unintentionally on behalf of the operator as well as happen quickly

16  such as a connection of a hose containing PCE becoming loose.

17       With these facts in mind, the cases the Insurers cite for the proposition that particular spills

18  need to be shown in order for there to be indemnity coverage are factually distinguishable from the

19  matter at hand. The Insurers start by citing *Smith v. Hughes Aircraft Co.*[102] In that case, Hughes

20  regularly dumped treated chemical waste into unlined ponds and occasionally the waste treatment

21  plant failed and chemical waste was spilled onto the floor or pushed into a drain that bypassed the

22  treatment plant.[103] The Ninth Circuit ruled that breaking down long-term waste practices into

23  _____

24      [98] *See* Declaration of Steve Sadler in Support of Miller Trust's Opposition to the Estate of Jack Miller, Deceased's Motion for Summary Judgment ("Sadler Decl."), filed herewith, at ¶ 16.

25      [99] *See* Stone Decl. at ¶ 15, Exh. 11 at 29:17-24.

26      [100] *See* Stone Decl. at ¶ 10, Exh. 6 at 33:16-34:13.

    [101] *See* RJN at ¶¶ 1-4, Exhs. 1-4.

27      [102] 22 F.3d 1432, 1438 (9th Cir. 1993).

28      [103] *Id.*



MEMORANDUM IN OPPOSITION TO INSURERS' MOTION FOR SUMMARY JUDGMENT

temporal components in order to find coverage where the evidence unequivocally demonstrates that the pollution was gradual was inappropriate.[104] Here, there is no evidence to support routine gradual releases of pollutants. Furthermore, PCE is a valuable substance that would not have just been wasted through a routine intentional dumping.[105] Therefore, evidence of *pure* phase PCE in the ground is more likely than not the result of a "sudden and accidental" spill rather than an intentional or routine discharge. The Insurers also cite *American States Ins. Co. v. Sacramento Plating, Inc.* for this proposition.[106] In that case, the court cites the fact that there was evidence of twenty-five years of regular spills during the plating process in addition to three large events which could have been considered sudden and accidental.[107] The court did not find that the spills were considered unexpected in that case since the building had been designed to limit the spread of any spills.[108] However, this case was decided prior to *Allstate* where the court ruled that an insurer would have a duty to indemnify if there was evidence of particular sudden and accidental spills in addition to routine spills. In this case, there is no evidence that there were routine, repeated, or intentional discharges of PCE nor have the Insurers developed any evidence to show that there were routine, repeated, or intentional discharges. Once again, due to the cost of PCE, it is highly unlikely that there were routine, repeated, or intentional discharges as PCE was not considered a waste product for purposes of dry cleaning.[109] Rather, it was an essential and expensive part of the process.[110]

Additionally, *State of California v. Allstate* can also be distinguished on the facts. The Insurers cite the case for the proposition that particular sudden and accidental events need to be shown in order for an insurer to be required to indemnify their insured.[111] However, the Insurers

---

[104] *Id.*

[105] *See* Wozniak Decl. at ¶10; Sadler Decl. at ¶ 18.

[106] 861 F. Supp. 964 (E.D. Cal. 1994).

[107] *Id.* at 969.

[108] *Id.* at 970.

[109] *See* Sadler Decl. at ¶¶ 16-17.

[110] *See* Sadler Decl. at ¶¶ 16-17.

[111] *See* Insurers' Motion at 13:1-17.

MEMORANDUM IN OPPOSITION TO INSURERS' MOTION FOR SUMMARY JUDGMENT

misunderstand the context of that holding. In *Allstate*, the State of California had designed and created a hazardous disposal waste site unlined waste pits which they then used to store liquid hazardous waste from all over the state.[112] The waste pits leaked waste into the groundwater due to negligent construction and there were also two flooding events which caused overflows of waste and water into a nearby canyon.[113] The State was held liable for the environmental pollution and damages and the State's insurers denied coverage.[114]

The Court addressed the issue of whether or not the State had to prove the damages caused by the "sudden and accidental" discharges.[115] A related issue the Court addressed was how to determine the indemnity requirement of an insurer faced with property damage caused by pollutant discharges, some of which were gradual and nonaccidental and others which were sudden and accidental.[116] The Court reasoned based upon a previous case that the test applicable was "whether a covered act or event subjected the insured to liability for the disputed property damage or injury under the law of torts."[117] The Court ruled that "where a single injury was caused by covered and excluded acts … where the damages caused by covered and excluded events appear indivisible …" then those damages become sums which the insured must pay for, and the insurer is liable for.[118] The Court then went on to state that "if the insured proves that multiple acts or events have concurred in causing … an indivisible amount of property damage … such that one or more of the covered causes would have rendered the insured liable in tort for the entirety of the damages, the insured's inability to allocate the damages by cause does not excuse the insurer from the duty to indemnify."[119] The insured can provide evidence showing the damages are indivisible: the insurer

---

[112] *See Allstate*, 45 Cal. 4th at 1015.

[113] *See id.* at 1016.

[114] *See id.* at 1016-17.

[115] *See id.* at 1028.

[116] *See id.* at 1030.

[117] *See id.*

[118] *See id.* at 1033-34.

[119] *See id.* at 1036-37.



MEMORANDUM IN OPPOSITION TO INSURERS' MOTION FOR SUMMARY JUDGMENT

can provide evidence that the damages are divisible.[120]

The Court then stated that their holding "does not extend indemnity to situations where the policyholder can do no more than speculate that some polluting events may have occurred suddenly and accidentally, or where sudden and accidental events have contributed only trivially to the property damage from pollution."[121] The Court cites other courts as properly holding no duty to indemnify where "the insured can make only 'unsubstantiated claims of sudden and accidental discharges in the face of *repeated, continuous discharges in the course of business*.'"[122] Only then did the Court state that an insurer is required to indemnify the insured for the entirety of damages only where "the insured can identify particular sudden and accidental events and prove they contributed substantially to causing indivisible property damage for which the insured bore liability …."[123] In this matter, first, it is not an insured suing an insurer; rather it is a third party suing an insured for the insurance assets of the insured. Therefore, this analysis does not apply with respect to the facts of this case. Second, this is a case where coverage was determined after liability; in fact, the Court essentially says that coverage cannot be determined until liability is determined as it is the basis of liability which determines if there is coverage. Third, similar to the facts in *Smith v. Hughes*, the Court distinguished cases involving routine repeated discharges in the course of business as requiring a showing of particular sudden and accidental events. In this case, there is no evidence supporting that routine, repeated discharges of pollutants occurred at Glo Dry Cleaning. Rather, the testimonial evidence and expert opinions support a triable issue of fact as to the occurrence of "sudden and accidental" events.

1. Written Discovery

The Insurers deny that the Miller Trust's responses to its written discovery create genuine triable issues of material fact.[124] However, the case law that the Insurers' cite to contend that the

---

[120] *See id.* at 1034.

[121] *See id.* at 1037.

[122] *See id.* at 1037 (citing *SMDA v. American Ins. Co.*, 572 N.W.2d 686, 705 (Mich. Ct. App. 1997); *Travelers Casualty & Surety Co. v. Superior Court*, 63 Cal. App. 4th 1460, 1460 (1998)) (emphasis added).

[123] *See id.*

[124] *See* Insurers' Motion at 5:11-7:14.



MEMORANDUM IN OPPOSITION TO INSURERS' MOTION FOR SUMMARY JUDGMENT

interrogatories cannot be used as evidence refers to *declarations* needing to be based upon personal knowledge in order for the statements to have evidentiary value.[125] The Federal Rules of Civil Procedure Rule 56(c)(1)(a) allows a party to cite to interrogatory responses to support an assertion that there is a genuine dispute as to a fact.[126] Furthermore, where the "Upon information and belief" appears to be a mere formality and the interrogatory responses are verified by the person responding under penalty of perjury, those responses can be used to evince facts.[127] The answers provided by the Miller Trust are also more than just a restatement of the complaint as they identify persons with potential knowledge and documents in support of the facts stated.[128] Therefore, the interrogatory responses can be used in a motion for summary judgment.

Furthermore, the responses identify documents which are evidence of a particular sudden and accidental event: the destruction of the concrete slab where the dry-cleaning equipment had been located.[129] There are additional documents which show that Jack Miller hired Jerry Joy & Associates to perform the work, that permits from the City of Stockton were acquired prior to performing the work and the work was performed as Jack Miller paid for it.[130] Those documents were provided as part of a voluntary document production to the Insurers in June of 2017.[131] The Insurers make a point of referencing the company name on the paperwork: the key is the address is still that of the Property and the person requesting the work be accomplished is Jack Miller, their insured.[132] Therefore, this evidence, in conjunction with the other evidence provided, creates a genuine issue of material fact as to whether "sudden and accidental" releases contributed to the contamination at issue here due to the destruction of the concrete slab.

---

[125] *See* Insurers' Motion at 7.

[126] *See Bona Fide Conglomerate, Inc. v. SourceAmerica*, No. 3:14-cv-00751-GPC-AGS, 2017 U.S. Dist LEXIS 116329, at *17 (S.D. Cal. July 24, 2017).

[127] *See id.* at *18-19.

[128] *See id.* at *19 (contrasting interrogatory responses with interrogatories that do no more than restate the allegations of the Complaint).

[129] *See* Stone Decl. at ¶ 28, Exh. 23.

[130] *See* Stone Decl. at ¶¶ 16-19, Exhs. 12-15.

[131] *See* Stone Decl. at ¶ 22, Exh. 18.

[132] *See* Stone Decl. at ¶¶ 16-19, Exhs. 12-15.



1      2.  Percipient Witnesses

2      The Insurers point to several witness depositions as evidence that there were no "sudden and

3  accidental" releases of PCE.[133] First, two of the witnesses, Gene Gini and Richard McDonald

4  worked at Glo Dry Cleaning prior to when Jack Miller owned the Property. Their testimony is

5  relevant to conditions at Glo Dry Cleaning during that time period. In any event, their testimony

6  that they do not know of any releases of PCE is evidence that there were no non-sudden and non-

7  accidental discharges. That *pure* phase PCE is in the ground is evidence that there must have been

8  sudden and accidental discharges of PCE.

9      Second, the Insurers refer to the testimony of James Morris and Helen Miller as evidence that

10  there were no sudden and accidental releases at Glo Dry Cleaning.[134] Given their limited role, it

11  would be surprising if they did. Helen Miller only remembers visiting the Property once and does

12  not recall being inside the dry cleaners at all.[135] James Morris says he visited the Property once in

13  1985 in connection with the unlawful detainer suit against Richard Calhoun, but does not recall if

14  he went inside the dry cleaners.[136] Considering the fact that they had barely been to the Property,

15  their lack of knowledge about the conditions of the Property makes perfect sense.

16      The last two witnesses cited by the Insurers are Dorothy Calhoun and Mark Calhoun, who

17  worked at Glo Dry Cleaning during Richard Calhoun's ownership and operation.[137] Dorothy

18  Calhoun was the wife of Richard Calhoun and worked in the front of the store handling the clothes

19  and dealing with customers.[138] In her own words, she "didn't know what all went on back there."[139]

20

21

---

22      [133] The Miller Trust has provided evidentiary objections to the testimony identified by the Insurers as
23  showing facts to support a lack of "sudden and accidental" releases. Those objections are hereby
    incorporated into this memorandum of points and authorities.

24      [134] *See* Insurers' Motion at 14:9-12.

25      [135] *See* Stone Decl. at ¶ 13, Exh. 9 at 17:1-25.

    [136] *See* Stone Decl. at ¶ 14, Exh. 10 at 40:13-41:24.
26
    [137] *See* Stone Decl at ¶ 9, Exh. 5 at 24:22-25:19; ¶10, Exh. 6 at 8:4-20.

27      [138] *See* Stone Decl at ¶ 9, Exh. 5 at 34:2-35:7.

28      [139] *See* Stone Decl at ¶ 9, Exh. 5 at 74:19-75:3.



It is not surprising then that she did not know about any spills, releases, or mechanical issues. Given her role at the dry cleaners, she would not have known about such matters.[140]

As for Dorothy's son, Mark Calhoun, he only worked in Glo Dry Cleaning on Saturday afternoons for a year and a half.[141] His job was only to sweep and mop up the front of the store, and he was only there for an hour or so once a week.[142] Therefore, his lack of knowledge is understandable.  Like his mother, Dorothy, he would not have known about sudden and accidental releases. His testimony is not evidence that there were no sudden and accidental spills as his knowledge base is limited.

The Declaration of Colleen Joy further serves to prove that the Insurers have provided no evidence supporting a lack of sudden and accidental releases while the Miller Trust has provided evidence to show at least one sudden and accidental release. Ms. Joy admitted in her declaration that she had not been involved in her husband, Jerry Joy's business, and that she had no documents from his business.[143] Therefore, it is not surprising that she had no personal knowledge of a sudden and accidental release.

Lastly, circumstantial evidence is sufficient evidence to prove "sudden and accidental" releases occurred, especially in cases like this, where direct evidence is lost due to the passage of time.[144] Considering California's strong public policy in favor of environmental protection, requiring direct testimony in cases like these would significantly hamper that policy.

3.  Expert Witnesses

Turning, finally, to expert witness evidence, the Insurers argue initially that the experts designated by Helen Miller were designated solely in her capacity as a counter-defendant.[145] Not

---

[140] *See* Stone Decl at ¶ 9, Exh. 5 at 35:4-12.

[141] *See* Stone Decl at ¶ 10, Exh. 6 at 42:20-43:1.

[142] *See* Stone Decl at ¶ 10, Exh. 6 at 9:3-24.

[143] *See* Joy Declaration, ECF No. 61-3 at ¶ 3.

[144] *See Niagara Mohawk Power Corp. v. Chevron USA, Inc.*, 596 F.3d 112, 131 (2d Cir. 2010) (citing *Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 547 (6th Cir. 2001)) (when direct evidence is lost due to the passage of time, it is "not objectionable" in CERCLA cases to base findings solely on circumstantial evidence).

[145] *See* Insurers' Motion at p. 16, fn. 57.



so. Helen Miller, individually and as trustee of the Miller Marital Deduction Trust, identified expert witnesses.[146] Although the caption on the expert disclosure happens to identify the disclosure as "counter-defendant" Helen Miller's, Helen Miller is a party in this matter and therefore, Helen Miller's expert witnesses are her expert witnesses regardless of her status as a plaintiff or counter-defendant.[147] The Insurers specifically asked counsel for Helen Miller if the experts were designated only for the counterclaim and were told that the expert witness reports were not limited by the role of the party in the litigation.[148] Helen Miller offered and made available her experts for depositions and the Insurers decided against deposing them.[149] Furthermore, the Insurers put forth rebuttal expert witnesses in response to the experts identified by Helen Miller before withdrawing them.[150] The Miller Trust is not obligated to depose its own experts.[151] If the Insurers had any uncertainty about the disclosure or the experts' retentions, it could have asked at deposition. It should not be heard to complain now.

Finally, before turning to the substances of the expert witness evidence, the Court should be aware that the Miller Trust's experts have reviewed additional data that was not available prior to their disclosures and have updated their expert opinions accordingly. Pursuant Rule 26, parties have the duty to supplement expert reports when "the party learns that in some material aspect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing …"[152] The environmental consultant for the Site here has continued to gather more data regarding

---

[146] *See* Stone Decl. at ¶ 4.

[147] *See Niemeyer v. Ford Motor Co.*, No. 2:09-cv-02091-JCM-PAL, 2012 U.S. Dist. LEXIS 4849 (D. Nev. Jan. 17, 2012) (court allowed defendant to use other defendant's expert witnesses as their own since all opinions were the same and plaintiff had opportunity to depose them); Fed. R. Civ. P. 26(2)(a) ("*a party* must disclose to other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.").

[148] *See* Stone Decl at ¶ 5, Exh. 1.

[149] *See* Stone Decl. at ¶ 6, Exh. 2.

[150] *See* Stone Decl. at ¶ 27, Exh. 22.

[151] *Celotex,* 477 U.S. at 324.

[152] Fed. R. Civ. P. 26(e)(1)(a).



the environmental conditions at the Site under the Regional Board's direction.[153] The additional data was not available prior to the expert witness disclosure deadline as the investigative work took time to get an approved work plan, the appropriate permits, and funding.[154] The additional data collected is material to the expert reports as they further the experts' understanding of the environmental conditions at the Site and provides new information as to how those Site conditions were created.[155] As such, the Miller Trust has the duty to provide supplemental expert reports based upon the new information found.[156]

Alborz Wozniak's opinion is that past dry cleaning operations at the Property resulted in PCE contamination at the Site.[157] This opinion is based upon the environmental data available as well as a number of governmental studies.[158] Those government studies also identified the most common release mechanisms for PCE from dry cleaners including equipment failure and accidental spills.[159] Additionally, the 2002 Florida Department of Environmental Protection Study was able to identify six distinct release mechanisms all of which could result in sudden and accidental spills and releases of PCE.[160] Mr. Wozniak notes that the extremely high PCE levels located where the dry cleaning operations occurred more likely than not is a sign that *pure* PCE was spilled at the Property.[161] Due to the value of PCE, it is unlikely that such a release would have been anything other than sudden and accidental.

Steven Sadler's expert opinions reinforce this conclusion. As an expert in dry cleaning operations, Mr. Sadler has knowledge of how dry cleaners operated and how the equipment was

---

[153] *See* Stone Decl. at ¶ 25, Exh. 20.

[154] *See* Stone Decl. at ¶ 25, Exh. 20. The Miller Trust would note that this is why a motion for a preliminary injunction to get more investigative work done is also before the court.

[155] *See* Stone Decl. at ¶ 25, Exh. 20; Wozniak Decl. at ¶ 11.

[156] Fed. R. Civ. P. 26.

[157] *See* Wozniak Decl. at ¶ 6.

[158] *See* Wozniak Decl. at ¶ 4, Exh. 1 at pp. 14-17.

[159] *See* Wozniak Decl. at ¶ 4, Exh. 1 at pp. 14-16.

[160] *See* Wozniak Decl. at ¶ 10.

[161] *See* Wozniak Decl. at ¶ 4, Exh. 1 at p. 15.



used.[162] His opinion is based upon that knowledge as well as the government reports on dry cleaner operations and PCE releases.[163] Based upon the specified release mechanisms identified in his report, his expert opinion is that the releases at the Property would be sudden and accidental.[164] Therefore, Mr. Sadler's opinions create a genuine issue of material fact such that a reasonable trier of fact could find for the Miller Trust.

Since the Insurers withdrew their expert witnesses, they have no ability to contradict the expert opinions from the Miller Trust. However, they have argued that expert witness testimony is not appropriate to determine if sudden and accidental discharges occurred based solely upon contamination in the ground.[165] The case cited, however, only states the expert's testimony was excluded because the court did not find his opinions regarding sudden and accidental releases based on scientifically reliable principles.[166] The court was not faced with a situation where it was the expert's experience providing the opinion.[167] In this case, Helen Miller's experts used a combination of their experience with dry cleaning operations, the environmental data from the Site, and governmental reports to provide a basis for their opinions.[168] Their opinions are more than "conclusory assertation or speculation" and therefore are proper expert testimony.[169] The Insurers cannot prove there is no dispute as to their conclusions and therefore there is a genuine issue of material fact.

## VII.    CONCLUSION

The question of whether the Insurer policies covers the decedent-insured's liability is not yet ripe because the decedent-insured, Jack Miller, has yet to be found liable. Even if the issue were ripe, the Insurers have not met its burden to conclusively prove as a matter of law that no "sudden

---

[162] *See* Sadler Decl. at ¶¶ 2-4.

[163] *See* Sadler Decl. at ¶¶ 6-20.

[164] *See* Sadler Decl. at ¶¶ 12, 14-15, 18.

[165] *See* Insurers' Motion at 15:16-19.

[166] *See Varlen Corp. v. Liberty Mut. Ins. Co.*, No. 13-cv-05463, 2017 U.S. Dist. LEXIS 162110, at *19-20 (N.D. Ill. Sept. 25, 2017).

[167] *See id.*

[168] *See* Wozniak Decl. at ¶ 4, Exh. 1; Sadler Decl. at ¶ 8, Exh. 1.

[169] *See Travelers*, 63 Cal. App. 4th at 1462.

1   and accidental" releases caused any property damage during the applicable policy periods. And

2   even if it had, the evidence demonstrates that, or at least creates a genuine issue of material fact as

3   to whether, one or more "sudden and accidental" releases caused some property damage during the

4   Insurers' policies.   For these reasons, the Insurers' motion for summary judgment should be

5   DENIED.

6           Respectfully submitted,

7   Dated: March 7, 2018                    PALADIN LAW GROUP® LLP

8                                    By:   */s/*  *Bret A. Stone*

9                                          Bret A. Stone
10                                         Counsel for Helen Miller and the Miller
                                           Marital Deduction Trust, by and through
                                           its trustees Helen Miller and James Morris

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



MEMORANDUM IN OPPOSITION TO INSURERS' MOTION FOR SUMMARY JUDGMENT